BURLINGTON & MISSOURI RIVER RAILROAD IN NEBRASKA, PLAINTIFF IN ERROR, V. MARTHA CROCKETT, ADMINISTRATOR, DEFENDANT IN ERROR.

1. **Railroad:** LIABILITY FOR INJURY TO EMPLOYE. The under boss of a gravel train gang was directed by his immediate superior to take men and dig out a car which had been partly covered and derailed by a fall of gravel from a high bank near by, and in pursuance of such order proceeded to dig out the car, and while so employed was killed by the embankment caving in. Prior to that time the custom had been to station a watchman to give notice to the workmen of danger from the falling bank, which was omitted on that occasion. *Held*, That the company was liable.

2. ———: ———. The conductor of a gravel train on a railroad, with a gang of men under his immediate control, in the employ of the railroad company, is, as to such men, the vice-principal of the railroad company and not a fellow servant.

3. ——: ——. A sub-boss under the immediate control and direction of the conductor or the person in charge of a gravel train is not, as to such conductor or person in charge of the train, a fellow servant.

ERROR to the district court of Lancaster county. Tried below before POUND, J.

*Marquett & Deweese,* for plaintiff in error.

*Sawyer & Snell* and *J. R. Webster,* for defendant in error.

MAXWELL, CH. J.

An opinion was filed in this cause at the last term of the court, judgment being reversed for want of a material allegation in the petition. 17 Neb., 574. Afterwards the parties entered into a stipulation that the petition be amended and the cause again submitted, either party to have leave to file an additional brief. The action is brought by the plaintiff, the mother of Clayborn Crockett, as administratrix of his estate, to recover damages for his death, caused by the caving of an embankment at a gravel pit where he and others were at work for the railroad company. The plaintiff below (defendant in error) claims to have established two propositions by the evidence, which she alleges are sufficient to sustain the verdict. *First,* That Crockett was under the control of one Wyatt, and was ordered by him to shovel out a certain car near the embankment, which car had been partially covered up and derailed by a fall of earth; and *Second,* That it had been customary to place a watch at or near the bank to give warning when it was apparent that it was about to fall, which precaution was omitted on this occasion.

It is contended on behalf of the plaintiff in error that neither of these propositions is supported by the evidence. This will require an examination of the testimony.

It appears from the testimony that for some months prior to Nov. 18, 1881, when the accident occurred, Clayborn Crockett had been in the employ of the railroad company as under boss of the shovelers of a gravel train, which at the time of the accident was being loaded with gravel at an embankment near Milford to be carried to Lincoln; that an ordinary day's work was sixty cars, which required three trips; that the embankment in question is about a mile and a half east of Milford, and on the south side of the track, and is reached by a spur or side track from the main line, the bank at the highest place being from 20 to 30 feet in height; that on the day the accident occurred a number of the hands were absent—the exact number does not appear, and there seems to have been an attempt on the part of the conductor (Wyatt) to accomplish the usual amount of work; that before noon there was a fall of earth from a high part of the bank, which struck one of the flat cars and partly buried it and threw one end off the track.

The attorney for the plaintiff in error who argued the case insists that there is no evidence to show that Wyatt ordered Crockett to shovel out the car and get it on the track.

One Jerry Wilson testified as follows:

Q. State to the jury, if you know, how Clayborn came to go there to unload that car.

A. It was a custom when we got in a pinch for Mr. Wyatt to help us out.

Q. This Wyatt was in charge of the train?

A. Yes.

Q. And Clayborn had charge of the men?

A. Yes, Mr. Wyatt was a piece off getting a tie to bear the car on the track when it fell.

Q. How far off had he gone?

A. Fifty or a hundred yards. When he started away he said to Clayborn, go in and get that car out as quick as you can; he always said to Clayborn go and do so and so.

One Calvin J. Montgomery testifies: "After that bank had fallen in the morning the same day John Wyatt (six or seven of the cars were loaded) told Clayborn to take those men and go there and clear up the tracks and get the cars ready by the time the Milford train came; Clayton did so and he worked there till dinner; after dinner he came back and he said to go and take some men and go back and clear the tracks; he was digging under the trucks and the bank caught him in this way (witness illustrates the position); the bank was on the south side and the track on the north side; before dinner we did not finish clearing out; after dinner he (Wyatt) told him to take some of the men and clear it and he would go and get a tie; he (Wyatt) went to the tool box and got a tie and had it on his shoulder, and before he got back the accident occurred."

S. Black testified as follows:

Q.   What happened to one of the cars that day?

A.   The bank had fallen down on it and knocked one end of the car off the track.

Q.   What was being done that day?

A.   Dug out part of it.

Q.   Who dug it out?

A.   The men working for Crockett.

Q.   How did it come that these men and Crockett were digging it out?

A.   Wyatt told them to.

Joseph Carter testified:

"In the forenoon there was a part of the bank fell down and broke the brake, and then we were shoveling that out so that we could get the train out at the usual time."

Q.   Who told you to shovel out that car?

A.   Wyatt.

Q.   Whom did he tell?

A.   All of us.

Q.   Did he tell any particular person?

A.   He told Mr. Crockett.

J. Mitchell testified:

Q.   You may tell the jury who were at work there at the car next to the bank where the accident happened at the time?

A.   Myself, this Mr. Crockett—he was in the center of the car next to the bank—and there was another man, Robert Reed; we were the only three men engaged in there at that time; the rest of the men were loading up the other cars.

Q.   How did you come to load that car?

A.   There were four or five more cars below that had been loaded; this car we commenced loading it in the morning; it was very cold that morning; we did not finish loading.it, because about eleven o'clock the bank caved in there and had knocked it partially off the track and broke the brake wheel.   In the afternoon when the men were called out and had gone to work Mr. Wyatt I believe gave orders to some of them to finish loading the car, and none of them would agree to load it except us two men; they were afraid that the bank would cave again; but myself and another man and Mr. Crockett were at the upper end of the car and Mr. Wyatt was down there, and he left our car and went to Crockett; I don't know what he said; anyhow Crockett came down and pitched in.

*          *          *          *          *          *

Deweese:   You did not hear what he said to Crockett?

A.   No.   He came down immediately, and he was engaged in helping us load that car.   We had been loading it I believe for three-quarters of an hour before the bank caved in.

Q.   The second time?

A.   Yes, that was the second time.

Mr. Wyatt, called as a witness by the plaintiff in error, testified on cross-examination as follows:

Q.   At the time of this accident where were you when the first fall of dirt occurred on that day?

A.   I was about two cars from the men where the dirt fell.

Q.   What direction?

A.   I was west.

Q.   What were you doing?

A.   Carrying water around for the men.

Q.   Then what did you do when the dirt fell?

A.   I don't remember that I did anything in particular. Well, I moved a part of the men from the other side across.

Q.   What did you do then?

A.   Then told Crockett that we would have to clear the dirt from the car and get it on the track when the engine came.

Q.   Did he proceed to clear up the dirt?

A.   Crockett and two men.

Q.   You said that "we."

A.   I meant that the dirt would have to be cleared away.

Q.   Did that mean yourself?

A.   It did if I had to go there.

Q.   Did you go?

A.   No, sir.

Q.   Did he go?

A.   Yes.

Q.   Did you tell him to take men?

A.   He had the privilege himself to take men.

Q.   Did you tell him to go and clear the cars?

A.   No, sir.

Q.   Was that the manner in which you were accustomed to give your orders there?

A.   Not at all times.

Q.   But on this day that is the way you spoke?

A.   Yes, as a general thing I speak that way, that we would have to do so and so.

He also testifies that the effect was that of a command —to go and do what was required.

There is a great deal of other testimony by the same witnesses tending to show that just before the accident Wyatt directed Crockett to clear the dirt away from around the car which had been derailed, and that while thus engaged the bank caved and fell on him, causing his death.

The objection that the testimony is not sufficient on that point to warrant the verdict is not sustained.    2d. That the testimony fails to show that it had been customary to keep a watchman to notify the shovelers that the bank was about to fall, and at the time of the accident this precaution had been omitted.

Joseph Carter testifies on that point as follows:

Q.    State to the jury what had been the custom of the company about protecting the employes from danger resulting from caving in, if anything?

A.    Always up to that time there was some one on the bank watching and seeing if there was any danger; and if there was any danger there was always notice given, so we got out of the way in time and none were hurt.

Q.    Who would station them up there?

A.    Mr. Wyatt.

Q.    Had anybody been stationed up there to watch and give warning this day of the accident?

A.    No, sir, nobody was there that day at all.

In this the witness is corroborated by nearly all the others.

Mr. Wyatt testifies on cross-examination as follows:

Q.    That was your custom, to go along there and when it became dangerous to tumble the bank down?

A.    When we got through the gravel we threw the bank.    If we thought there was danger we would throw the bank.

Q.    You would in both cases?

A.    Yes.

Q.   Would you have men stationed up there on the bank if it was dangerous?

A.   Not on the top of the bank.

Q.   Anywhere else?

A.·  On the top of the cars.

Q.   Did you ever perform that duty?

A.   I have.

Q.   And you would undertake to give warning to the men if there was danger?

A.   Yes.

Q.   You would take a position on the cars, and if you saw any cracks you would tell the boys to get out?

A.   If I saw any move in the bank, yes, sir.

Q.   On this day you were not watching the bank?

A.   Was not at the time the bank fell, or had not been that day.

There is no proof whatever that Crockett knew that there was no one watching the bank. The position was a dangerous one, and this seems to have been known to Crockett, but with a watchman to give warning that the bank was about to fall, one of the witnesses testifies that the shovelers could get upon the flat cars and escape injury. Had the usual watch been kept, this accident probably would not have occurred. There is sufficient proof of negligence, therefore, to sustain the verdict. But it is said that Crockett was a fellow servant with Wyatt, and that the servant assumes all the risk of danger that is apparent.

This question was before this court in *C., St. P., M. & O. R. R. Co. v. Lundstrom,* 16 Neb., 254. In that case it was held that a conductor of a construction train on a railroad, with a gang of men engaged to work as day laborers for the railroad company, but under the immediate orders of such conductor, is as to such men the vice principal of the railroad company, and not a fellow servant of such men. And an act of gross negligence on the part of such conductor, whereby the lives of such men were placed

10

in jeopardy while working under his immediate orders and direction, and one of them was killed, was the negligence of the company, for which it was liable.    That case was ably argued, and the attorneys in the case furnished elaborate briefs, which contained references to the leading authorities up to that time, and the decision was not reached until the authorities pro and con had been carefully considered ; and now, after the lapse of one and a half years, we see no reason to change our decision.    That decision, therefore, will be adhered to, and it is decisive of this case. Here, Crockett, although an under boss of the hands, was under the immediate direction of Wyatt, who was the responsible head and represented the company.    So far as the necessity of obeying Wyatt was concerned Crockett seems to have been in precisely the same condition as any of the other workmen.    To all intents and purposes he was one of them.    The testimony tends to show that Crockett was an intelligent colored man, about twenty-four years of age; that he was sober, industrious, and, so far as appears, a man of good character in all respects ; that the plaintiff was largely dependent upon him for support, and that he was in the habit of remitting to her from $15 to $25 each month from his wages.    The verdict was for $925, a sum that would seem to be much less than the plaintiff's damages ; but as no complaint is made on that ground it cannot be considered here.    Upon the whole case we find no error in the record, and the judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.